[Cite as *State v. Smith*, 2013-Ohio-576.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 98280

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## TAUNEE SMITH

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED IN PART,
REVERSED IN PART, AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-557838

**BEFORE:** Boyle, P.J., E.A. Gallagher, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** February 21, 2013

**ATTORNEY FOR APPELLANT**

Stephen L. Miles
20800 Center Ridge Road
Suite 405
Rocky River, Ohio   44116

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Brent C. Kirvel
Assistant County Prosecutor
The Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

{¶1} Defendant-appellant, Taunee Smith, appeals his sentence and convictions. We affirm in part, reverse in part, and remand for further proceedings.

Procedural History and Facts

{¶2} In December 2011, Smith was indicted in a multicount indictment on the following charges: two counts of aggravated murder, in violation of R.C. 2903.01(A) and (B); two counts of aggravated burglary, in violation of R.C. 2911.11(A)(1) and (A)(2); two counts of aggravated robbery, in violation of R.C. 2911.01(A)(1) and (A)(3); four counts of kidnapping, in violation of R.C. 2905.01(A)(2); and one count of having a weapon under disability, in violation of R.C. 2923.13(A)(2). All the counts carried one- and three-year firearm specifications, a repeat violent offender specification, and a notice of prior conviction.

{¶3} Smith pleaded not guilty to all the charges. He was charged along with three codefendants: Taylor Dammons, Leonte Cromity, and William Lee.[1]

{¶4} Prior to trial, Smith moved to bifurcate the having a weapon while under disability count, seeking to have that count and the repeat violent offender specifications tried to the bench. The trial court granted the motion, and the matter proceeded on the remaining charges before a jury.

---

[1] Chrishawn Slade was indicted separately in a capital case. He ultimately reached a plea agreement where he pleaded guilty to murder and agreed to testify against Smith at his trial.

{¶5} We summarize the following facts from the evidence presented at trial. We will discuss the facts in further detail as they pertain to the raised assignments of error.

{¶6} On August 29, 2011, around 10:30 in the evening, DeJohn Dammons was shot dead with a .40-caliber gun in the driveway of his home on Breckenridge Road in Euclid. At the time of the shooting, DeJohn's fiancée, Ebony Johnson, was inside their home, along with her two daughters, Faith Smedley and Deasia Dammons.

{¶7} According to Ebony, she was in her bedroom when she heard a "loud banging" on her front door. She went to the front door and discovered "someone" banging a gun on the door window and ordering her to open the door. She immediately ran upstairs and called 911. Then, her front door was "kicked in." The perpetrator ran upstairs, grabbed the phone from her, and pushed her into her children's room and turned on the light, all the while holding a gun to her face and ultimately striking her in the eye with the gun. Ebony further testified that, after the person left, she heard a gunshot and found DeJohn lying face down in the driveway.

{¶8} Euclid police officer Donald Ivory testified that he responded to a 911 hang up from the Breckenridge Road residence. While en route, he learned that there was a followup call regarding a shooting within one to two minutes after the hang-up call. Officer Ivory spoke with Ebony at the scene who provided a description of the suspect as a "dark-skinned black male, approximately five feet, eight inches."

{¶9} At trial, Ebony denied that she described the suspect as dark skinned and instead stated that the suspect was "brown skinned." She further identified Smith as the

individual who charged into her home. She acknowledged that she had identified another person the night of the shooting but that she was never 100 percent certain. Ebony further acknowledged that the first time she identified Smith was after seeing his booking picture in connection with a news story identifying him as being charged in connection with DeJohn's homicide. According to Ebony, her daughter first saw the news story while at her grandmother's house and told her grandmother that was the person that she saw in her bedroom the night of the shooting. Ebony looked up the news story on the Internet and saw Smith's booking photo.

{¶10} The state presented the testimony of several witnesses, including all of the codefendants, as well as Chrishawn Slade, as to the events leading up to the fatal shooting. Through the testimony of DeJohn's younger brother, Taylor Dammons, the state established that Taylor set the events in motion leading to the homicide of his brother.

{¶11} Approximately six weeks before the shooting, Taylor had been fired from DeJohn's restaurant after money was missing from the cash register. Taylor, who was bitter over being fired and the fact that money was withdrawn from his last paycheck, testified that he orchestrated a plan to rob DeJohn. The plan required a "group" with "pistols" to ambush DeJohn outside his house when he returned home from work at night, taking any cash that DeJohn had and going inside the house.

{¶12} The state established that DeJohn was a large, muscular man who regularly boxed. Despite DeJohn's size, Taylor testified that DeJohn would turn over the money if confronted by a group with pistols. According to Taylor, DeJohn did not carry a gun.

**{¶13}** Taylor testified that he, along with some friends, drove to DeJohn's house on three occasions prior to August 29th — the first time simply as a dry run. Taylor intended to send his friends to confront DeJohn and execute the plan at the house while he waited in another vehicle. On subsequent occasions, the plan was not executed because of "bad timing" or people being around outside. Taylor identified Chrishawn Slade and Leonte Cromity as both his friends and participants in the earlier attempts.

**{¶14}** On the night of the shooting, while Taylor was home, he received a text from Slade, stating, "I got you." Later that evening, around midnight, Taylor received a call from Slade, who was using Cromity's cell phone. According to Taylor, Slade told him that "the robbery didn't go well, DeJohn was shot, and that he lost his phone there."

**{¶15}** Euclid police detective Daniel Novitski testified as to the extensive investigation that led to the initial arrest of Slade, followed by the other codefendants: first, Cromity; second, Taylor; then William Lee; and lastly, Smith. Det. Novitski testified that the police recovered photos from the cell phone discovered at the scene and that Ebony identified one of the photos as a possible match to the perpetrator who charged into her house. The police later determined that the photo was a match for Slade.

**{¶16}** A few days later, Det. Novitski interviewed Slade, following Slade's arrest by Cleveland police in connection with a raid on a house. Slade initially denied any involvement in DeJohn's death, claiming that his cell phone had been stolen. Slade told the police that he had spent that night at the Quality Inn with his friend, "Tay."

**{¶17}** The police investigated Slade's alibi, obtaining a video showing Slade and Leonte Cromity arriving together at the Quality Inn approximately an hour after the shooting. Upon being interviewed, Cromity denied being with Slade on the night of the shooting. He immediately recanted after being shown the video but claimed he "forgot." The police later obtained Cromity's cell phone records that linked his phone to the area of DeJohn's residence at the time of the homicide. Faced with this information, Cromity admitted to police that he was with Slade, putting himself at the scene as the "get-away" driver. Cromity further informed the police of the conversation between Slade and Taylor following the shooting and that two other males were involved — friends of Slade. Det. Novitski testified that Cromity led them to a house on Noble Road where he believed one of the males lived. The police later obtained an electric bill in Smith's name that connected him to the residence on Noble Road.

**{¶18}** During the course of the police investigation of DeJohn's homicide, Cromity and another individual were apprehended in the course of a burglary in Euclid. The police recovered two firearms from the arrest.

**{¶19}** Det. Novitski further testified that, based on the information obtained from Cromity, the police brought Taylor back into the station for further questioning. Taylor also consented to a search of his cell phone where police recovered the text from Slade to Taylor on the night of the shooting. Taylor ultimately admitted to his involvement.

**{¶20}** Following the retrieval of the text and the information obtained from Taylor, the police obtained an arrest warrant for Slade. Shortly following Slade's arrest, the police obtained an arrest warrant for Taylor and Cromity.

**{¶21}** According to Det. Novitski, Cromity ultimately led the police to the identity of William Lee (nickname "Work") after Cromity ran into Lee while they were both incarcerated. On September 3, 2011, the Cleveland police arrested Lee after he fled from a car being driven by Smith. Lee was carrying a 9 mm pistol and was charged with having a weapon while under disability. Det. Novitski testified that they determined from Cromity's telephone records that a few texts were sent back and forth between Cromity and Lee on the night of the shooting, including a text asking Lee if "he was still coming."

**{¶22}** Det. Novitski interviewed Lee and questioned him regarding his involvement in the homicide. According to Det. Novitski, Lee initially denied any involvement but, within five minutes, Lee ultimately admitted to being involved and stated that "he was just brought in as an extra body." Det. Novitski further testified that, during the course of his interview, he asked Lee about the name of the fourth individual identified by Slade as "T." Lee claimed that he did not know "T's" real name but that he had a picture of him on his Facebook account. Through Lee's sister, the police obtained access to Lee's Facebook account and the photos. Police subsequently presented the Facebook photos to Slade, who identified Smith as "T." The other codefendants, Cromity and Lee, also

positively identified Smith in a photo array presented by police as the fourth person there on the night of the shooting.

{¶23} Thereafter, police obtained an arrest warrant for Smith — the final codefendant arrested in connection with the homicide, and the only one to deny involvement. All of the codefendants agreed to a plea agreement that included a dismissal of some of the counts and the potential for less prison time provided that they cooperated at Smith's trial.

{¶24} Slade, Cromity, and Lee all testified at trial and identified Smith as the fourth person who accompanied them the night of the shooting. Although all three accounts varied as to exact details of the evening, including who entered the house and who shot DeJohn, the three consistently testified that Smith left the car and accompanied Slade and Lee to confront DeJohn. Slade also testified that he got $2,000 from DeJohn.

{¶25} The state also offered the testimony of FBI agent Timothy Kolonick, who testified that he "came into contact with a written letter that was sent by Smith to Gregory Craig." Agent Kolonick subsequently met with Craig, confronted him with a copy of the letter written by Smith, and had him initial each page. The state called Craig to testify at trial. According to Craig, he is Smith's friend and has known him all his life. The letter asked Craig to notify police and tell them that Smith was with him on August 29 at Lakeshore Cocktails all night. Craig testified, however, that he has never been to Lakeshore Cocktails and that he burned the letter after receiving it.

**{¶26}** Following the presentation of the state's case, the trial court granted Smith's Crim.R. 29 motion for acquittal as to Count 1 of the indictment, aggravated murder, in violation of R.C. 2903.01(A), but denied it as to the remaining counts.

**{¶27}** Smith offered two witnesses to testify on his behalf. Victor Parker, who was being held in the county jail at the time of the trial, testified that in the week prior he ran into Lee who used to supply him with pills, while in the "bullpen" — an area in the county jail. According to Parker, Lee asked him if "Toon" was being held on his floor. (Toon is Smith's nickname.) Parker told him that he did not know Toon but asked if Toon was a codefendant in his case. Lee then told him that "he really [is] the fall guy." He further disclosed that Toon was not with him during the robbery — "he's just the fall guy."

**{¶28}** On cross-examination, Parker acknowledged that Toon confronted him after the hearing that he was talking about him and that, upon being confronted by Toon, he then shared what Lee said.

**{¶29}** Smith also offered the testimony of his investigator, John Kassay. Kassay testified as to photos that he took of Smith's right hand, evidencing a deformity in his index finger. Smith offered the photos into evidence.

**{¶30}** On cross-examination, Kassay testified that in police training the firearm instruction includes learning to shoot with one's inferior hand.

**{¶31}** After the presentation of all the evidence, the trial court charged the jury on the counts contained in the indictment, as well as the lesser-included offenses of

aggravated murder, namely, murder in violation of R.C. 2903.02(A) (purposeful intent) and murder in violation of R.C. 2903.02(B) (felony murder). The trial court further charged the jury under the complicity statute, instructing the jury that a person who aids and abets another in the commission of a crime is equally culpable as the principal offender.

{¶32} The jury acquitted Smith of the aggravated murder charge contained in Count 2 but found him guilty of the lesser-included offense of murder with no firearm specifications attached. The jury also returned a not guilty verdict of the aggravated robbery counts but guilty of the remaining counts, namely, the aggravated burglary and kidnapping counts, with no firearm specifications.

{¶33} As to the count and specifications tried to the bench, the state established that Smith had pled guilty to attempted murder on January 13, 2003. Relying on this evidence and the evidence presented at trial, the trial court found Smith guilty of having a weapon while under disability and guilty of the RVO specifications.

{¶34} The trial court subsequently sentenced Smith to 15 years to life for murder, ten years for the merged aggravated burglary counts, ten years for the merged kidnapping charges, and three years on the having a weapon while under disability, all to be served consecutively, for a total of 35 years to life.

{¶35} Smith now appeals, raising the following five assignments of error:

I. The trial court erred by denying the appellant's motion to suppress the appellant's in-court identification by Ebony Johnson and Faith Smedley.

II.   The appellant's due process right to being found guilty by a jury unanimously was violated when the jury found him guilty of two counts of murder pursuant to R.C. 2903.02(A) and R.C. 2903.02(B) on the same verdict form, and two counts of aggravated burglary pursuant to R.C. 2911.11(A)(1) and R.C. 2911.11(A)(2) on the same verdict form.

III.   The appellant's convictions were against the manifest weight of the evidence.

IV. The trial court erred by sentencing the appellant to a disproportionate sentence compared to similarly situated offenders.

V.   The trial court erred by sentencing the appellant to consecutive sentences.

### Eyewitness Identification

{¶36} In his first assignment of error, Smith argues that the trial court erred by allowing Ebony Johnson and Faith Smedley to identify him in court as the person who held them at gunpoint and forced his way into their house.   He contends that the trial court should have granted his motion to suppress because their in-court identification was the result of an unduly suggestive booking photograph seen by them on television almost three months after the shooting.   He further contends that Ebony's description of the perpetrator provided to the police did not match his physical description and that she had previously identified Slade as the perpetrator, evidencing that any identification was unreliable.

{¶37} With respect to a motion to suppress, "the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses."   *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994).

The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac*, 2d Dist. No. 20662, 2005-Ohio-3733, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994). Accepting those facts as true, the appellate court must then independently determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*

> To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" and that the identification itself was unreliable under the totality of the circumstances.

*State v. Bates*, 2d Dist. No. 23707, 2012-Ohio-6039, ¶ 15, quoting *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶38} It is well settled that "'when a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances.'" *State v. Murphy*, 91 Ohio St.3d 516, 534, 747 N.E.2d 765 (2001), quoting *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992). "The rationale for excluding a tainted pretrial identification is to protect the defendant from misconduct by the state." *State v. Brown*, 38 Ohio St.3d 305, 310, 528 N.E.2d 523 (1988).

**{¶39}** But in the absence of any action taken by the state, there is no basis to exclude an in-court identification. Indeed, "[i]f no state action was involved in any pretrial exposure to a television newscast showing the defendant's picture, any alleged suggestiveness goes to the weight and credibility of the witness's testimony, rather than to its admissibility." *State v. Erkins*, 1st Dist. No. C-110675, 2012-Ohio-5372, ¶ 66, citing *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 55 (10th Dist.). Thus, "[w]itness exposure to photographs of the suspect shown on television before the identification does not require suppression of the identification." *Erkins* at ¶ 66.

**{¶40}** Here, police did not engage in any suggestive procedure resulting in the in-court identification. Ebony and Faith's pretrial exposure to Smith was based on a news story featured on television and the Internet. There was no state action taken in this case. As for Ebony and Faith seeing Smith's photo on television three months after the shooting, Smith's counsel cross-examined them greatly as to the identification — leaving the jury to weigh the credibility of their testimony.

**{¶41}** We find no error in the trial court's denial of Smith's motion to suppress.

**{¶42}** The first assignment of error is overruled.

<u>Verdict Forms and Jury Instructions</u>

**{¶43}** In his second assignment of error, Smith argues that his due process rights were violated by virtue of two verdict forms presented to the jury. He argues that the verdict forms did not match the instructions given by the judge and that the forms

improperly merged multiple offenses and presented them in a single charge, thereby raising an issue of jury unanimity.

{¶44} Initially, we note that Smith never objected to the jury instructions or verdict forms despite given the opportunity to do so. He therefore has waived all but plain error. An error constitutes plain error if it is obvious and affects a substantial right. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio 2126, 767 N.E.2d 216, ¶ 108. Plain error exists only where it is clear that the verdict would have been otherwise but for the error. *State v. Skatzes*, 104 Ohio St.3d, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 52. Notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Phillips*, 74 Ohio St.3d 72, 83, 656 N.E.2d 643 (1995).

    A.    *Murder Verdict Form*

{¶45} We turn first to the verdict form for Count 2 — lesser-included offense of aggravated murder as charged in Count 2 of the indictment. The form states the following under the heading "Verdict":

We, the Jury in this case being duly empaneled and sworn, do find the Defendant, Taunee Smith, (*) _____ of Murder in violation of §2903.02(A) and (B) of the Ohio Revised Code, a Lesser Included Offense of Aggravated Murder as charged in count and [sic] Two of the Indictment.

{¶46} Below this paragraph, contained the following instruction:

(*) INSERT IN INK:    "GUILTY" or "NOT GUILTY"

{¶47} Within the blank space, the jury wrote "GUILTY." The form was signed by all twelve jurors.

**{¶48}** In its charge to the jury, the trial court stated in pertinent part the following:

What is the lesser offense?   This is an alleged violation of 2903.02(A) and/or (B).   If you find the State failed to prove beyond a reasonable doubt all the essential elements of aggravated murder, then your verdict must be not guilty of that offense.   In that event or if you're unable to unanimously agree, you will continue your deliberations to decide whether the State has proven beyond a reasonable doubt all of the essential elements of the lesser included offense of murder.

Before you can find the defendant guilty of murder, you must find beyond a reasonable doubt that on or about the 29th day of August, 2011, and in Cuyahoga County, Ohio, the defendant, A, purposely caused the death of DeJohn Dammons or — this is again disjunctive or the alternative — caused the death of DeJohn Dammons as a proximate result of committing or attempting to commit aggravated burglary and/or aggravated robbery.

**{¶49}** The written jury instructions provided to the jury also charged on the lesser-included offense with the use of the phrase "and/or."   The verdict form, however, solely stated "and."

**{¶50}** Smith argues that the instructions and the verdict form deprived him of an unanimous verdict because "there is no telling if some of the jurors found him guilty of murder pursuant to R.C. 2903.02(A) and if some of the jurors found him guilty of murder pursuant to R.C. 2903.02(B)."   He argues that the verdict form requires reversal and entitles him to a new trial.   We disagree.

**{¶51}** Both sections of the statute carry the same penalty and constitute the offense of murder.   R.C. 2903.02(A) states: "No person shall purposely cause the death of another * * *."   R.C. 2903.02(B) states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

**{¶52}** In support of his argument, Smith relies on the Ninth District's decision in *State v. Ward*, 9th Dist. No. 09CA009720, 2011-Ohio-518, where the court found plain error based on the trial court's failure to sever an aggravated robbery count into two counts where the state's case focused on the prosecution of several distinct acts. We find *Ward* distinguishable from the instant case. Indeed, even Smith acknowledges that *Ward* involves a single murder and single aggravated burglary. Thus, the confusion that the Ninth District found in *Ward* regarding several distinct offenses presented within a single charge simply does not exist in this case. *Id.* at ¶ 12.

**{¶53}** Conversely, the Fifth District addressed this very same issue and found no plain error. *See State v. Collins*, 5th Dist. No. 2003-CA-0073, 2005-Ohio-1642. Like the instant case, the jury was presented with a single verdict form for the charges relating to violations of R.C. 2903.02(A) and 2903.02(B)— both charges supporting a single count of murder. The jury returned a guilty verdict that did not specify guilty or not guilty of murder under R.C. 2903.02(A) or 2903.02(B). Collins argued on appeal that he was denied his right to a unanimous verdict because it was not clear if the jury unanimously agreed to the theory of culpable conduct supporting the guilty verdict for murder. *Id.* In rejecting Collins's argument, the Fifth District relied on the United States Supreme Court's decision in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), noting the following:

> In *Schad*, the defendant was convicted of first-degree murder after the prosecution advanced theories of premeditated murder and felony murder. The jury was not instructed to unanimously find defendant guilty based on one of the proposed theories of guilt. The *Schad* court found that different

mental states of moral and practical equivalence (premeditated and felony murder) may serve as alternative means to satisfy the mens rea element for the single offense of murder, without infringing upon the constitutional rights of the defendant.

The *Schad* court noted: "We have never suggested that in returning general verdicts in [cases proposing multiple theories] the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, 'different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'" *Id.* at 631-632, 111 S.Ct. 2491, 115 L.Ed.2d 555, quoting *McKoy v. N. Carolina* (1990), 494 U.S. 433, 449, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Blackmun, J., concurring).

*Id.* at ¶ 157-158.

{¶54} The Ohio Supreme Court has likewise applied the reasoning of *Schad*, rejecting a defendant's claim that the right to an unanimous verdict includes a right to an unanimous theory of culpable conduct supporting that verdict. *See Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 53-54.

{¶55} We further note that the jury was instructed several times that it must unanimously agree as to each count and to consider each count separately. Under such circumstances, Ohio courts have consistently held that the jury is presumed to have reached an unanimous verdict. *See*, *e.g.*, *State v. Bell*, 112 Ohio App.3d 473, 679 N.E.2d 44 (3d Dist.1996); *State v. Luks*, 8th Dist. No. 89869, 2008-Ohio-3974; *State v. Shafer*, 8th Dist. No. 79758, 2002-Ohio-6632; *State v. Hunter*, 2d Dist. No. 11853, 1991 Ohio App. LEXIS 626 (Feb. 12, 1991). Notably, in addition to all 12 jurors signing their names on the verdict form, all 12 jurors raised their hands upon being polled as to their finding of guilty on the murder charge. And while the record contains sufficient evidence to

support either lesser-included offense, we note that the jury's verdict finding Smith guilty of a separate count of aggravated burglary, coupled with the undisputed evidence that DeJohn died from a bullet fired during the course of the burglary, dispels any fear of the jury being confused over the charge and its guilty verdict of murder.

**{¶56}** Accordingly, we find no plain error with respect to the murder conviction.

B.      *Verdict Form for Two Counts of Aggravated Burglary*

**{¶57}** Smith next challenges the trial court's use of a single verdict form for convicting him of two separate counts of aggravated burglary, violations of R.C. 2911.11(A)(1) and (A)(2).    Unlike the murder verdict form used to cover a single count of murder, this verdict form essentially "merged" two separate counts into a single verdict form, forcing the jury to make a single determination for two separate counts.

**{¶58}** While it is obvious that the trial court, as well as the attorneys, believed that the two counts would merge as allied offenses if the jury found Smith guilty under each of them, a merger of the offenses is only permitted after the jury renders a separate verdict on each count.   *See* Crim.R. 31.   Nonetheless, we do not find plain error as it relates to Count 4, a violation of R.C. 2911.11(A).   Here, the record contains a written question from the jury to the trial judge specifically related to this verdict form, asking the following question:

Counts 4 & 5 merged creates a problem for us, the jury.   We don't find the Defendant guilty of the Firearm Specifications.   Counts 4 & 5 combined, we find that the offender "DID" or is "Guilty" of Count 4, but NOT GUILTY of Count 5.   Can we separate Counts 4 and 5?

**{¶59}** With the agreement of the both the state and defense, the trial judge responded to the question as follows:

> 4 & 5 are under both possible theories either/or (in the disjunctive).
> * * * criminal offense, to wit: Theft, R.C. 2913.02(A)(1) & the offender had a deadly weapon or dangerous ordnance, to wit: firearm on or about his person or under his control
> [OR]
> * * * Theft, R.C. 2913.02(A)(1), & the offender recklessly inflicted, or attempted to
>
> inflict physical harm on DeJohn Dammons.

**{¶60}** While this instruction may have been permissible if the jury was considering a single count, the same does not hold true when the jury was presented with two separate counts of the indictment on one verdict form. Any concern as to whether the jury unanimously agreed as to Count 4 is eliminated by virtue of the jury's question to the trial judge. Conversely, however, it is clear that Smith should have been acquitted of Count 5 and that the jury would have returned a not guilty verdict as to this count if presented with a separate verdict form. Accordingly, we uphold the conviction as it relates to Count 4 and vacate the conviction as it relates to Count 5.

**{¶61}** The second assignment of error is overruled in part and sustained in part.

<u>Manifest Weight of the Evidence</u>

**{¶62}** In his third assignment of error, Smith challenges his convictions as being against the manifest weight of the evidence. He contends that the evidence presented by the state to support the murder, aggravated burglary, and kidnapping convictions lacked credibility. He further argues that the absence of any physical evidence tying him to the crime scene warrants a reversal. We disagree.

{¶63} When a defendant asserts that a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶64} Smith argues that Ebony and Faith's testimony identifying him as the perpetrator who entered their home was not credible and arose only after they knew the police had arrested him in connection with the crime. Smith further contends that any identification of him was not reliable because (1) Ebony previously identified Slade, and (2) Ebony's physical description of the suspect given to the police did not match him. He further contends that the only other evidence tying him to any involvement in the crimes comes from the codefendants — all of whom have extensive criminal records, repeatedly lied to the police throughout the investigation, contradicted each other as to the details of the evening, and clearly had a motive to testify against him to secure a favorable deal with the state. While all of these assertions are true, the jury heard these factors and had the opportunity to weigh the credibility of the witnesses.

{¶65} We further note that, even if the jury did not believe Ebony and Faith's identification, they could have still found Smith guilty under the complicity charge provided by the court. Indeed, even if the jury believed that Slade was the perpetrator to

enter the home, Smith's participation and assistance that night subjects him to liability as an aider and abettor.

{¶66} As for Smith's participation —  Slade, Cromity, and Lee's testimony all identified him as the fourth person who accompanied them that night and exited the car, along with Slade and Lee, to take down DeJohn.   This was not a case of Smith merely being present at the scene.   Additionally, the state established that the plan to rob required at least three people to ambush DeJohn because of DeJohn's size.   And although Slade's testimony implicated Smith as the shooter, whereas Lee and Cromity's testimony implicated Slade as the shooter, the identity of the shooter was not crucial to obtaining a conviction against Smith.   Again, the state prosecuted Smith under the complicity statute.   The jury was charged that it could find Smith guilty of any of the offenses if it found that he aided and abetted in the commission of the offenses.   Here, the testimony of all the codefendants consistently identified Smith as the fourth person who assisted in the crimes.

{¶67} Further, we find that aside from the codefendants' testimony, Smith implicated himself in the crimes by virtue of the letter he sent to his lifelong friend, obviously seeking a false alibi for the night of the shooting.

{¶68} Under well-settled precedent, we are constrained to adhere to the principle that the credibility of witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve.   *See State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).   As this court has previously recognized, a defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented

at trial. *State v. Gaughan*, 8th Dist. No. 90523, 2009-Ohio-955, ¶ 32, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958 at ¶ 21.

{¶69} As for the having a weapon while under disability count that was tried to the bench, we likewise cannot say that the verdict is against the manifest weight of the evidence. In support of this count, the state presented evidence that Smith had been convicted of attempted murder in 2003. The mere fact that the jury did not convict Smith of the firearm specifications did not preclude the trial judge from finding that Smith was carrying a firearm. The trial judge was free to believe Slade's testimony that Smith had a gun.

{¶70} Based on the record before us, we cannot say that this is the exceptional case where the jury clearly lost its way. Accordingly, the third assignment of error is overruled.

<u>Sentence</u>

{¶71} In his fourth and fifth assignments of error, Smith argues that the trial court erred in imposing the sentence. He contends that his sentence is not proportionate to other similarly-situated offenders, namely, the codefendants, and that the trial court failed to consider the new sentencing guidelines outlined in H.B. 86 to warrant consecutive sentences.

{¶72} An appellate court must conduct a meaningful review of the trial court's sentencing decision. *State v. Johnson*, 8th Dist. No. 97579, 2012-Ohio-2508, ¶ 6, citing *State v. Hites*, 3d Dist. No. 6-11-07, 2012-Ohio-1892, ¶ 7. Specifically, R.C.

2953.08(G)(2) provides that our review of consecutive sentences is not an abuse of discretion. An appellate court must "review the record, including the findings underlying the sentence or modification given by the sentencing court." *Id.* If an appellate court clearly and convincingly finds either that (1) "the record does not support the sentencing court's findings under [R.C. 2929.14(C)(4)]," or (2) "the sentence is otherwise contrary to law," then "the appellate court may increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing." *Id.*

**{¶73}** H.B. 86, which became effective on September 30, 2011, revived the language provided in former R.C. 2929.14(E) and moved it to R.C. 2929.14(C)(4). The revisions to the felony sentencing statutes under H.B. 86 now require a trial court to make specific findings when imposing consecutive sentences. R.C. 2929.14(C)(4) provides, in relevant part:

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison

term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶74}** In this case, the trial court failed to comply with the mandate of H.B. 86 before imposing consecutive sentences. Indeed, the trial court failed to make a single finding on the record. The trial court merely stated the term of the sentence on the record. Accordingly, we sustain the fifth assignment of error, vacate the consecutive sentence, and remand for resentencing on this issue.

**{¶75}** With respect to Smith's proportionality argument, we note that there is no requirement that codefendants receive equal sentences. *See State v. Nelson*, 11th Dist. No. 2008-L-072, 2008-Ohio-5535. Indeed, R.C. 2929.11(B) states that a felony sentence must be "consistent with sentences imposed for similar crimes committed by similar offenders." The goal of felony sentencing is to achieve consistency not uniformity. *State v. Pruitt*, 8th Dist. No. 98080, 2012-Ohio-5418, ¶ 26, citing *State v. Marshall*, 8th Dist. No. 89551, 2008-Ohio-1632; *State v. Dawson*, 8th Dist. No. 86417, 2006-Ohio-1083 (although an offense may be similar, distinguishing factors may justify dissimilar treatment). Further, "consistency in sentencing does not result from a case-by-case comparison, but by the trial court's proper application of the statutory sentencing guidelines." *State v. Dahms*, 6th Dist. No. S-11-028, 2012-Ohio-3181, ¶ 22, citing *State v. Hall*, 179 Ohio App.3d 727, 2008-Ohio-6228, 903 N.E.2d 676, ¶ 10 (10th Dist.).

**{¶76}** Smith's argument, however, is based on the trial court imposing a consecutive sentence resulting in 35 years to life. Given that we are vacating the consecutive sentences, we find that Smith's fourth assignment of error is moot. Further, Smith can raise the issue of proportionality upon remand for a new sentencing hearing on the issue of consecutive sentences. *See State v. Wilson*, 8th Dist. No. 91971, 2010-Ohio-1196, ¶ 101.

**{¶77}** In summary, we affirm Smith's convictions for murder, kidnapping, having a weapon while under disability, and a single count of aggravated burglary as contained in Count 4. We vacate Smith's conviction for aggravated burglary as stated in Count 5. The trial court's judgment sentencing Smith to 15 years to life for murder, ten years for aggravated burglary, ten years for kidnapping, and three years for having a weapon while under disability is affirmed. The portion of the trial court's judgment ordering that the sentences be served consecutively is vacated. The case is remanded to the trial court to consider whether consecutive sentences are appropriate and, if so, to enter the proper findings on the record.

**{¶78}** Judgment affirmed in part, reversed in part, and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellant and appellee share in the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having

been affirmed in part, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR