[Cite as *State v. Erkins*, 2012-Ohio-5372.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-110675 |
| | | TRIAL NOS. B-1006797B |
| Plaintiff-Appellee, | : | B-1007149B |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| KENYATTA ERKINS, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause
Remanded

Date of Judgment Entry on Appeal:  November 21, 2012

*Joseph T. Deters*, Hamilton County Prosecuting Attorney*,* and *Ronald W. Springman*, Chief Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Christine Y. Jones*, for Defendant-Appellant.

Please note:  This case has been removed from the accelerated calendar.

**DINKELACKER, Judge.**

{¶1}     Following a bench trial, defendant-appellant Kenyatta Erkins was convicted in two separate cases of six counts of aggravated robbery under R.C. 2911.01(A)(1), one count of robbery under R.C. 2911.02(A)(1), and three counts of complicity to robbery under R.C. 2911.02(A)(1) and R.C. 2923.03(A)(2).  He filed a timely appeal from those convictions, presenting seven assignments of error for review.  We find some merit in his arguments.  Consequently, we affirm the trial court's judgment in part, reverse it in part, and remand the case to the trial court to resentence Erkins and to correct clerical errors in the judgment entries.

### I. The Investigation

{¶2}     The record shows that the Cincinnati Police Department and other local police agencies had received a number of reports from local residents who had been followed home and robbed after gambling at the Hollywood Casino (formerly Argosy) and Grand Victoria Casino in Lawrenceburg, Indiana.  The various police agencies formed a task force to apprehend the perpetrators.  After many hours of viewing surveillance video from the casinos, police focused their attention on Erkins and co-defendant Ugbe Ojile.  Police officers eventually obtained a warrant to put a GPS tracking device on a dark green Dodge Magnum that Erkins frequently drove.  They also obtained a warrant to record the cell phone conversations between Erkins and Ojile.

{¶3}     Police discovered that Erkins and Ojile used the same method of operation in each case.  Erkins would go into the casino and look for victims who were carrying large amounts of cash, and who he and Ojile believed would be easy targets.  They often targeted gamblers who appeared to be Asian because they

believed those individuals would be less likely to call the police. Ojile would wait in a car outside the casino because he had been banned from entering the Hollywood. Erkins would call Ojile and discuss specific "targets." They would wait for the "targets" to leave and follow them home. When the victim got out of his or her car, they would approach the victim at gunpoint and steal the victim's money and other valuables. Erkins's girlfriend, Amy Hoover, also participated in a few of the robberies.

{¶4} On October 7, 2010, police officer Kyle Ingram was working undercover in the Hollywood Casino, posing as an elderly gambler. He walked around slowly with a cane, and when he saw Erkins walking past him, he pulled a large amount of cash out of his pocket and started counting it. Erkins saw him and called Ojile to report that he had a "target."

{¶5} When Ingram left the casino, Erkins followed him to the parking lot. Ingram got into his van and left. Erkins got in the Dodge Magnum with Ojile and followed Ingram's van. Ingram left the highway on a predetermined exit and pulled into a gas station. The Magnum pulled into the parking lot of a nearby Waffle House. Police surrounded the car and arrested Erkins and Ojile.

{¶6} Police searched the Magnum and found a backpack that contained a .40-caliber Glock handgun, a live round of ammunition, and a BB gun. They also found three cell phones, a black hooded sweatshirt, camouflage gloves, Ojile's personal papers, and papers belonging to one of the robbery victims. In the trunk, they found duct tape that was used to tie up one of the robbery victims.

{¶7} Police also executed a search warrant at the apartment where Ojile and his girlfriend, Nikki Williams, lived. They found a .40-caliber Glock Magnum handgun with a magazine containing 11 rounds of ammunition, as well as additional

.40-caliber ammunition. They also found a driver's license, a bank card and a social security card belonging to one of the robbery victims.

## II. The Robberies

### A. Michael Weisbrod

{¶8} On February 9, 2009, Michael Weisbrod, a professional poker player, went to what was then the Argosy Casino and won over $8,000. Surveillance tapes from the casino showed that Erkins was following Weisbrod that night. Weisbrod drove home to his apartment in Oakley, arriving after 1:00 a.m. Shortly after he arrived home, a young woman knocked on his door and asked him if anyone was living in the apartment downstairs. Without opening the door, Weisbrod told her "no," and she left.

{¶9} The following night, something similar occurred. After hearing a knock on his door, Weisbrod looked through the peephole and saw a man at the door. The man asked if anyone was living in the downstairs apartment. Weisbrod said "no," and the man walked away. Weisbrod watched him until he was out of sight.

{¶10} Shortly after 9:00 p.m. on the next night, February 11, 2009, Weisbrod was home alone when all the lights in the room suddenly went off. Because his neighbors still had electricity, Weisbrod went to the basement of his apartment building to look for the circuit breaker, using the light from his cell phone to see.

{¶11} As Weisbrod neared the circuit breaker, someone yelled for him to get down on the ground, which he did. He was then attacked by what he believed to be two people, a male and a female. They informed him that they had a gun. They

proceeded to tie his hands and legs with duct tape, and ordered him to tell them where the money was. Weisbrod told them that it was in his dresser.

{¶12} The woman went upstairs. When she returned, she said that the money was not there. The attackers threatened Weisbrod and poked him in the back of the head with the gun. Weisbrod clarified that the money was in the nightstand next to his bed. The woman went back upstairs and retrieved the money. After threatening Weisbrod again, the attackers left.

{¶13} Weisbrod freed himself and asked his neighbors to call the police. The robbers stole between $8,000 and $9,000 in cash, and Weisbrod's cell phone, wallet and car keys. He could not identify the robbers at the time, although Hoover testified that she was the woman who had knocked on his door and who had retrieved the money during the robbery.

{¶14} On April 3, 2009, Weisbrod won over $8,000 at the Hollywood casino. He left after midnight and made sure that no one followed him. When he turned into the driveway leading to his apartment, he noticed that one of the motion-activated lights was on, which caused him concern. Nevertheless, he drove around to the back of his apartment building and got out of his car.

{¶15} When he was trying to get in the door of his apartment, two African-American men approached him. He described them as being of medium build and wearing hoods and jeans. They pulled out a gun, threatened him, and ordered him to get on the ground. They reached into his pockets and took his wallet and cash. They then fled from the scene in a white SUV.

{¶16} The area was well-lit and Weisbrod was able to get a good look at his attackers. He told the investigating officer that if he saw the men again, he could identify them. Six months later, Weisbrod saw television news stories about the

arrest of Erkins, Ojile and Hoover. He identified Erkins and Ojile as the men who had robbed him the second time. He recognized Hoover as the women who had knocked on his door before the earlier robbery. Ojile also told details about the first robbery of Weisbrod to Tyrone Tanks, another inmate at the Hamilton County Justice Center.

### B. Bovang Eab

{¶17} Bovang Eab, a Cambodian native, left the Hollywood Casino with $2,000 in the early morning hours of June 28, 2010. He drove to his brother's and sister's house in Madeira. He parked his car a few houses away. When he got out of his car, an African-American man, wearing a hood and wielding a gun, pushed him. Another man slammed Eab's head to the ground. The two men stole Eab's money, wallet, car keys, cell phone, credit card, identification card, and an ATM receipt. They then left the scene in a four-door, dark-colored sports car. Eab could not identify his assailants, but surveillance tapes showed Erkins following Eab as Eab left the casino on the night of the robbery.

### C. Sitangshu Das

{¶18} On August 15, 2010, Sitangshu Das, a native of Bangladesh, went to the Hollywood Casino to play poker. He left for home in the early morning hours. As he drove down his street, Das noticed a dark-colored car following him. When he pulled into his driveway, the car pulled into a neighbor's driveway a few houses away.

{¶19} Das saw a man get out of the car and walk slowly towards him before disappearing from Das's sight. As Das got out of his own car to go into the house, a six-foot African-American man wearing a black mask, black gloves, and dark clothes approached him. Das ran from the man, and the man chased after him.

{¶20}    The man caught Das and pushed him to the ground, dislocating his fingers. The attacker ordered Das to empty his pockets. Das told him that he did not have anything with him. Das's cell phone and keys fell out of his pockets, and his attacker stole those items and fled. Das went to the hospital to be treated for his injuries. When he returned home, his car was missing. It was later found about a block from his home. Das discovered that his check card and a small amount of cash were missing from the car.

{¶21}    Das later identified the Dodge Magnum that Erkins had been driving as the car that had followed him. Surveillance tapes from the casino showed Erkins following Das as he left the casino on the night of the robbery.

### D.  Kiran Racherla

{¶22}    Kiran Racherla went with a friend to the Hollywood Casino to play blackjack. He won approximately $100. He and his friend left the casino at 5:00 a.m. on October 3, 2010, and drove to Racherla's apartment complex in Blue Ash.

{¶23}    After Racherla parked his car, he became alarmed at the sight of a man who had emerged from behind a tree. He woke his friend, who had been sleeping, and the two of them got out of the car. Racherla attempted to call 911 from his cell phone. His friend attempted to open the apartment door, but was having trouble, so he fled, leaving Racherla alone.

{¶24}    At that point, an African-American male, wearing a dark mask and hood and brandishing a gun, ordered Racherla to sit on his knees. Racherla refused, and told his attacker that the police were coming. Upon hearing a siren, Racherla tried to flee but the attacker struck him three times with the gun and threatened to shoot him. The attacker put his hand in Racherla's left pants pocket, pulled out his cell phone headset, threw it on the ground, and fled.

{¶25} The Blue Ash police arrived, and paramedics took Racherla to the hospital. He had large a gash in his head that required staples to close. Again, surveillance tapes from the casino showed Erkins following Racherla as he left the casino that night. The police also had cell phone records showing that Erkins's cell phone was in the Blue Ash area the night of the attack. Additionally, when Erkins and Ojile were arrested, police recovered a gun that had been stolen from Daniel Duncan, another robbery victim, from their car. Racherla's DNA was found on that gun.

### E. Alan Boogher

{¶26} On September 7, 2010, Alan Boogher was playing craps at the Grand Victoria Casino while his wife stood by him. He had had a successful night, and surveillance tape showed him collecting substantial winnings at the cash payout window. He and his wife left the casino shortly after midnight.

{¶27} Surveillance tapes showed Ojile, who was not banned from the Grand Victoria, in the area where Boogher was gambling. When Boogher and his wife got in their car to leave the casino, Ojile got into a black Volkswagen Jetta owned by Nikki Williams, Ojile's girlfriend, and followed Boogher's car. Erkins, driving the Dodge Magnum, also followed them.

{¶28} Boogher and his wife live near Dayton, Ohio. On their way home, they stopped at a rest area. The Magnum and the Jetta also pulled into the rest area near them. The Booghers switched drivers, and then left the rest area without using the facilities. Ojile and Erkins followed them a short distance, but then turned around and headed south toward Cincinnati.

### F. Michael Li and Tony Quach

{¶29}   On October 6, 2010, Michael Li and Tony Quach, both residents of Columbus, Ohio, left the Hollywood Casino at approximately 10:00 p.m.  The police had already arrived at the casino and had set up surveillance.  They were also monitoring the cell phone conversations between Erkins and Ojile.  From those conversations, the police officers determined that Li and Quach were the intended "targets."  Li and Quach left the casino parking lot in a black Lexus.  Erkins and Ojile followed them in the Dodge Magnum onto Interstate 275.  The police stopped Li's and Quach's car under the pretense of a traffic stop to prevent them from being robbed.  When the stop was made, the police officers saw Ojile slam his fist on the steering wheel, seemingly in frustration.

### III.  Search and Seizure

{¶30}   In his first assignment of error, Erkins contends that the trial court erred by denying his motion to suppress evidence.  He argues that the initial stop of his vehicle, as well as his subsequent arrest, and the search of the vehicle, violated his Fourth Amendment rights.  This assignment of error is not well taken.

{¶31}   Appellate review of a motion to suppress presents a mixed question of law and fact.  We must accept the trial court's findings of fact as true if competent, credible evidence supports them.  But we must independently determine whether the facts satisfy the applicable legal standard.  *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Fisher*, 1st Dist. No.  C-080497, 2009-Ohio-2258, ¶ 7.

{¶32}   If there is a reasonable and articulable suspicion that an automobile and its occupants are subject to seizure for a violation of the law, stopping that automobile and detaining its occupants is reasonable under the Fourth Amendment.

*Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *State v. Lopez*, 166 Ohio App.3d 337, 2006-Ohio-2091, 850 N.E.2d 781, ¶ 13 (1st Dist.). Reasonable suspicion is a less demanding standard than probable cause. *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *Lopez* at ¶ 13. An officer who has probable cause necessarily has a reasonable and articulable suspicion. Therefore, probable cause is a complete justification for a stop. *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23; *State v. Burnett*, 1st Dist. Nos. C-110565, C-110566 and C-110567, 2012-Ohio-1631, ¶ 7.

{¶33} An arrest without a warrant requires probable cause. In determining whether probable cause to arrest existed, a court must ascertain whether, at the time of the arrest, the police officer had sufficient facts and circumstances within his knowledge to warrant a prudent person in believing that the defendant was committing or had committed an offense. *State v. Heston*, 29 Ohio St.2d 152, 155-156, 280 N.E.2d 376 (1972); *State v. Ruehlmann*, 1st Dist. No. C-100784, 2011-Ohio-6717, ¶ 13; *Fisher* at ¶ 10. The court can consider the collective knowledge of police officers involved in a common investigation in determining whether probable cause existed. *State v. Henderson*, 51 Ohio St.3d 54, 57, 554 N.E.2d 104 (1990); *State v. Taylor*, 174 Ohio App.3d 477, 2007-Ohio-7066, 882 N.E.2d 945, ¶ 14 (1st Dist.).

{¶34} Before they stopped and arrested Erkins and Ojile, the police had seen surveillance video of Erkins following casino patrons who were later robbed at gunpoint at their homes. On the night of the arrest, police had recorded cell phone conversations between Erkins and Ojile in which they conspired to rob casino patrons. They specifically targeted Ingram, the undercover police officer posing as a disabled casino patron. Video surveillance tapes showed Erkins following Ingram as he left the casino. Erkins and Ojile then got into the Dodge Magnum that had been

10

involved in several other robberies and followed Ingram's car until Ingram exited the interstate and stopped. Then the police surrounded the Magnum and arrested Erkins and Ojile.

{¶35} The record shows that the police knew sufficient facts to warrant a prudent person in believing that Erkins and Ojile were committing or had committed robbery. Therefore, the officers had probable cause to stop their vehicle and arrest them.

{¶36} Erkins next argues that the warrantless search of the Dodge Magnum violated his Fourth Amendment rights. An inventory search of a lawfully-impounded vehicle is an exception to the general prohibition against warrantless searches. *State v. Hathman*, 65 Ohio St.3d 403, 405-406, 604 N.E.2d 743 (1992). To satisfy constitutional requirements, the inventory search must be conducted in good faith and "in accordance with reasonable standardized procedure(s) or established routine." *Id.* at paragraph one of the syllabus; *State v. Glenn*, 1st Dist. Nos. C-000206 and C-000210, 2000 Ohio App. LEXIS 4843, *9 (Oct. 20, 2000). While those procedures need not be in writing, the state must show that the police department has a standardized, routine policy, and that the officer's conduct conformed to that policy. *State v. Flynn*, 3d Dist. No. 13-06-11, 2006-Ohio-6683, ¶ 17; *State v. Bozeman*, 2d Dist. No. 19155, 2002-Ohio-2588, ¶ 23.

{¶37} After Erkins and Ojile were arrested, the Dodge Magnum was impounded and towed to the Hamilton County Sheriff's impound lot. The inventory officer searched the car according to the standard procedural manual for the inventory search of impounded vehicles. As provided in the manual, the officer cataloged every item found in the car. He left the items where they were found,

photographed them, and recorded them on the proper form, as required by the policy manual.

{¶38} Because the officer conducted the search in good faith and did not use it as a ruse to uncover evidence of a crime, it was a valid inventory search. *See Hathman* at 407; *Glenn* at *9-10. The search did not violate Erkins's Fourth Amendment rights, and the trial court did not err in overruling his motion to suppress. We overrule Erkins's first assignment of error.

### *IV. Weight and Sufficiency*

{¶39} In his second assignment of error, Erkins contends that the evidence was insufficient to support his convictions. In his fourth assignment of error, he contends that the trial court erred in overruling his Crim.R. 29(A) motions for judgments of acquittal, which is the same as a claim that the evidence was insufficient to support his convictions. *State v. Zou*, 1st Dist. No. C-110515, 2012-Ohio-1911, ¶ 7. These assignments of error are not well taken.

{¶40} The relevant inquiry, when reviewing the sufficiency of the evidence is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offenses proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Russ*, 1st Dist. No. C-050797, 2006-Ohio-6824, ¶ 13.

{¶41} R.C. 2911.01(A)(1), aggravated robbery, provides that "[n]o person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or the offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." R.C. 2911.02(A)(1), robbery,

provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person, or under the offender's control."

{¶42} In the counts involving Weisbrod, Eab, Das, and Racherla, Erkins points to minor inconsistencies in the witnesses' testimony. These arguments go to the weight of the evidence, not its sufficiency, which is a separate concept. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 54 (1997); *State v. Jones*, 1st Dist. No. C-090137, 2010-Ohio-4114, ¶ 42. Erkins also argues that no physical evidence connected him to the crimes. That assertion is not supported by the record. But even if it was, no rule exists that witness testimony must be corroborated by physical evidence. *State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 58 (1st Dist.).

{¶43} Erkins also argues that the state failed to prove the three counts of complicity to robbery, which were the counts involving Boogher, Li and Quach, and Ingram. He makes much of the fact that the theft offenses in these counts were not completed. He argues that he and Ojile did not take any action that would have risen to the level of an attempt or an actual theft offense. We disagree.

{¶44} Robbery under R.C. 2911.02(A)(1) is "an offense which itself prohibits an attempt." *State v. Still*, 11th Dist. No. 93-L-195, 1994 Ohio App. LEXIS 5506, *5 (Dec. 19, 1994). A criminal attempt occurs when an offender "purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), paragraph one of the syllabus, *overruled on other grounds, State v. Downs*, 51 Ohio St.2d 47, 364 N.E.2d 1140 (1977). A substantial step involves conduct that is "strongly indicative of the actor's

criminal purpose." *State v. Andrews*, 171 Ohio App.3d 332, 2007-Ohio-2013, 870 N.E.2d 775, ¶ 78 (1st Dist.), quoting *Woods* at paragraph one of the syllabus. This standard focuses on the defendant's overt acts that convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention to prevent the crime when the criminal intent becomes apparent. *Woods* at 132; *Holmes* at ¶ 19.

{¶45}     R.C. 2923.03(A)(2), the complicity statute, states that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense." To aid or abet is to assist or facilitate the commission of a crime, or to promote its accomplishment. *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus; *State v. Holmes*, 181 Ohio App.3d 397, 2009-Ohio-1241, 909 N.E.2d 163, ¶ 22 (8th Dist.); *Russ*, 2006-Ohio-6824, at ¶ 18.

{¶46}   In the cases of Boogher and Li and Quach, the evidence showed that Ojile and Erkins, acting in concert, had targeted them as their intended victims. One of them followed their victims out of the casino, consistent with the modus operandi in the other robberies. They followed the victims' cars, but were prevented from actually committing the theft offense. Thus, the evidence showed they took substantial steps showing their criminal purpose to rob the victims. They would have carried out the underlying theft offenses had they not been prevented from doing so. Thus, there was sufficient evidence to support the complicity to robbery convictions involving those victims.

{¶47}   The same is true of the count in which Ingram was the intended victim. Erkins contends that the evidence showed only that he and Ojile simply had stopped at the same exit as Ingram. We disagree. Their cell phone conversations showed that they had specifically targeted Ingram as a victim. Erkins had followed

him out of the casino. He and Ojile then followed Ingram's car on the highway until he got off at the exit, and they parked near where Ingram had parked. Thus, they took substantial steps showing that they intended to rob Ingram. It did not matter that the object of their intent was factually or legally impossible if they could have committed the offense had the circumstances been what they believed them to be. *See Andrews*, 171 Ohio App.3d 332, 2007-Ohio-2013, 870 N.E2d 775, at ¶ 80.

{¶48} In sum, our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the state had proved all the elements of aggravated robbery, robbery, and complicity to robbery. Therefore, the evidence was sufficient to support the convictions.

{¶49} We note that in the case numbered B-1006797B, the trial court convicted Erkins of robbery in count two. Count one of the indictment charged him with conspiracy to commit robbery. The judgment entry mistakenly stated that Erkins was found guilty of robbery in count one for the same offense. Erkins correctly argues that a defendant cannot be convicted of conspiracy to commit robbery and robbery for the same offense. R.C. 2923.01(B); *State v. Truitt*, 1st Dist. No. C-050188, 2011-Ohio-1885, ¶ 17-18. Even though the trial court merged the sentence imposed on count one with the sentence imposed on count two, the finding of guilt on count one is improper. Consequently, we reverse the finding of guilt on count one in the case numbered B-1006797B and remand the matter to the trial court to vacate that finding of guilt.

{¶50} We also note that the judgment entries in these cases contain a number of typographical errors. In the case numbered B-1006797B, the judgment entry incorrectly states that in count two, Erkins was convicted of robbery under R.C.

2911.01(A)(1). Erkins was convicted under R.C. 2911.02(A)(1). In the case numbered B-1007149B, the judgment entry incorrectly states that Erkins was convicted in counts 22, 28 and 29 of complicity to robbery under R.C. 2923.03(A)(4). He was actually convicted under R.C. 2923.03(A)(2). Consequently, we also remand the case to the trial court to correct the judgment entries. *See* Crim.R. 36; *State v. Lattimore*, 1st Dist. No. C-010488, 2002 Ohio App. LEXIS 731, *4-5 (Feb. 22, 2002).

{¶51} Except as set forth above, we sustain Erkins's second and fourth assignments of error only as they relate to count one of the case numbered B-1006797B. We overrule Erkins's second and fourth assignments of error in all other respects, and we remand the cause to the trial court to correct the errors in the judgment entries.

{¶52} In his third assignment of error, Erkins contends that his convictions were against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse Erkins's convictions and order a new trial. Therefore, the convictions were not against the manifest weight of the evidence. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. Blair*, 1st Dist. Nos. C-100150 and C-100151, 2010-Ohio-6310, ¶ 24. Erkins is primarily arguing that the witnesses' testimony was not credible, but matters as to the credibility of witnesses were for the trier of fact to decide. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116; *Blair* at ¶ 23. We overrule Erkins's third assignment of error.

### V. Sentencing

{¶53} In his fifth assignment of error, Erkins contends that the trial court's sentences were contrary to law. He contends that the 31-year aggregate sentence he

received was excessive. While we disagree that his sentences were excessive, we do find that some of the sentences were contrary to law, and we remand the matter to the trial court for resentencing.

{¶54} Although neither party raises the issue, the record shows that Erkins was sentenced after September 30, 2011, the effective date of 2011 Am.Sub.H.B. No. 86 ("H.B. 86"). Therefore, he should have been sentenced under its provisions. *See State v. Jones*, 1st Dist. No. C-110603, 2012-Ohio-2075, ¶ 14-16. This court has held that even under H.B. 86, we still employ the two step analysis set forth in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 14, when reviewing felony sentences. *State v. Railey*, 1st Dist. No. C-120029, 2012-Ohio-4233, ¶ 16; *State v. Alexander*, 1st Dist. Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 9. Thus, we must first determine whether Erkins's sentences were contrary to law. *Railey* at ¶ 16; *Alexander* at ¶ 9.

{¶55} The offenses of which Erkins was convicted were first-degree and second-degree felonies. The sentences ranged from three to five years, all of which fell within the applicable statutory ranges. *See* R.C. 2929.14(A)(1) and (A)(2).

{¶56} But the trial court ordered some of the sentences to be served consecutively to each other. H.B. 86 revived the requirement in R.C. 2929.14(C) that trial courts make findings before imposing consecutive sentences. *Alexander* at ¶ 13; *Jones* at ¶ 17. While the court is not required to use "talismanic words," it must be clear from the record that the trial court actually made the findings required by the statute. *Alexander* at ¶ 16; *Jones* at ¶ 22.

{¶57} In this case, the record does not show that the court made the findings required before the imposition of consecutive sentences. Consequently, we must hold that the sentences were contrary to law, and we are constrained to remand

the case to the trial court for resentencing. We note, however, that the failure to make findings is the only reason that we reverse the sentences.

{¶58} We also note that in its final judgment entry, the court stated that Erkins had been found guilty of count four in the case numbered B-1007149B, and sentenced him to three years' imprisonment on that count to be served consecutively with some of the other counts. But, in a previous entry, the court had stated that it had found Erkins not guilty of that count. Consequently, we also remand the matter to the court to correct that error and vacate the conviction in count four. We therefore, sustain Erkins's fifth assignment of error.

### VI. Trial Court's Correction of Clerical Error

{¶59} In his sixth assignment of error, Erkins contends that the trial court erred by changing its verdict. He argues that the trial court originally convicted him of three counts of conspiracy to commit robbery, offenses for which he was not indicted, and later improperly changed the verdicts to complicity to robbery. This assignment of error is not well taken.

{¶60} The record shows that the trial court incorrectly stated in its original judgment entry that it was convicting Erkins of three counts of conspiracy to commit robbery, crimes for which he was not charged. The trial court subsequently realized its mistake and journalized an entry nunc pro tunc stating that he had been convicted of three counts of complicity to robbery, which were the correct offenses. The court did not change its verdict. It simply corrected a clerical error, which is permissible under Crim.R. 36. *State v. Valdez*, 5th Dist. No. 05-CA-00094, 2006-Ohio-3298, ¶ 88-92; *Lattimore*, 2002 Ohio App. LEXIS 731, at *5-6. Consequently, we overrule Erkins's sixth assignment of error.

### VII. Identification Evidence

{¶61} In his seventh assignment of error, Erkins contends that the trial court erred in allowing Weisbrod to identify Erkins in court as one of the persons who robbed him. He argues that the in-court identification was the result of unduly suggestive pretrial techniques used by the state and that the identification was not reliable. This assignment of error is not well taken.

{¶62} We first note that Erkins failed to file a motion to suppress the identification evidence. Therefore, he waived any error, except plain error. *State v. Bates*, 1st Dist. No. C-040698, 2005-Ohio-3394, ¶ 16-18; *State v. Williamson*, 2d Dist. No. 19832, 2003-Ohio-6541, ¶ 17.

{¶63} Erkins contends that the state did not follow the procedure for identifications set forth in R.C. 2933.83, which requires any law-enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt specific procedures for conducting the lineups. *State v. Ruff*, 1st Dist. No. C-110250, 2012-Ohio-1910, ¶ 5. In this case, there was no live lineup or photo lineup.

{¶64} The record shows that when Weisbrod was robbed the second time, it occurred in the well-lit parking lot of his residence. He was able to get a good look at the faces of his attackers. He told the investigating police officer that if he saw the attackers again, he would be able to identify them. Several months later, Weisbrod saw news reports about the arrest of Hoover, Erkins and Ojile, which displayed pictures of them. Weisbrod recognized them and was able to identify them to the police. Because no lineup occurred, the provisions of R.C. 2933.83 did not apply.

{¶65} Generally, a trial court must suppress a pretrial identification of a suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the circumstances. *State v. Waddy*, 63 Ohio

St.3d 424, 438, 588 N.E.2d 819 (1992); *State v. Bell*, 1st Dist. No. C-030726, 2004-Ohio-3621, ¶ 16. The defendant bears the burden of proving both prongs of the test. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v. Smith*, 1st Dist. Nos. C-080712 and C-090505, 2009-Ohio-6932, ¶ 16. Suggestive identification procedures are unreliable if they create a substantial likelihood of misidentification. *Waddy* at 439; *Smith* at ¶ 16.

{¶66} Witness exposure to photographs of the suspect shown on television before the identification does not require suppression of the identification. If no state action was involved in any pretrial exposure to a television news cast showing the defendant's picture, any alleged suggestiveness goes to the weight and credibility of the witness's testimony, rather than to its admissibility. *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, 940 N.E.2d 634, ¶ 55 (10th Dist.); *State v. Ward*, 10th Dist. No. 00AP-241, 2001 Ohio App. LEXIS 588, *8-11 (Feb. 20, 2001), citing *State v. Brown*, 38 Ohio St.3d 305, 310-311, 528 N.E.2d 523 (1988).

{¶67} The record shows that both Weisbrod's pretrial identification and his subsequent in-court identification of Erkins were reliable and that there was no likelihood of misidentification. The in-court identification was the result of Weisbrod's previous identification of Erkins. Consequently, Erkins has failed to show that the court erred in allowing Weisbrod's in-court identification of Erkins, must less that it committed plain error. We overrule Erkins's seventh assignment of error.

### VII. Summary

{¶68} In sum, we reverse the conviction on count four in the case numbered B-1007149B and the finding of guilt on count one in the case numbered B-1006797B. We vacate the sentences imposed, and we remand the case for resentencing and for

the trial court to correct the clerical errors in the judgment entries.  We affirm the trial court's judgment in all other respects.

Judgment affirmed in part, reversed in part, and cause remanded.

**HILDEBRANDT, P.J.,** and **CUNNINGHAM, J.,** concur.

Please note:

The court has recorded its own entry this date.