[Cite as *State v. Houston*, 2020-Ohio-5421.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-190598<br>TRIAL NO. B-1700535 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| SHAWNDRE HOUSTON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: November 25, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna* for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1} Following a jury trial, defendant-appellant Shawndre Houston was convicted of aggravated murder under former R.C. 2903.01(A), with an accompanying firearm specification. We find no merit in his seven assignments of error, and we affirm the trial court's judgment.

### *Facts and Procedure*

{¶2} The record shows that Heywood Thompson owned the Indulge VSP Lounge ("the lounge") in Springdale, Ohio. Various promoters rented the facility to host events, and the lounge would provide food, drink, and security. Thompson hired private security guards for the events. He generally stationed two security guards inside the facility and one in the parking lot. Thompson prohibited weapons in the club and used a "double pat-down" system where patrons were patted down both at the entrance to the building and again inside the bar. Security cameras were placed in numerous locations.

{¶3} On January 26, 2017, the club was rented for an event involving exotic dancers. Thompson had three security guards in the club that night, and one in the parking lot. The guard in the parking lot was Bobbie Long, a retired police officer. The promoter also brought two of her own security guards.

{¶4} A fight started on the dance floor and security was able to get it under control. The fight resumed a short time later near the men's restroom. David Salter and his friends attacked Houston and his friends. Thompson saw Salter "sucker-punch" a guard in the back of the head while that guard was restraining another patron. Thompson then ordered a "code black," and all patrons were asked to pay their tabs and leave. All doors were then locked.

{¶5} Footage from the security cameras showed security guards trying to restrain Salter while he kept trying to attack Houston. It also showed Houston with facial bruises and a black eye. The security guards separated the men and forced them out a side door into an alley that divided the lounge's parking lot from the lot of an adjacent Super 8 Motel. Long had come in from the parking lot and was waiting in the alley.

{¶6} Thompson and the security guards formed a wall to separate Salter and Houston, who continued to yell at each other. Long pushed Salter and his friends behind him to prevent Houston and his friends from reaching them. He said that Salter was trying to de-escalate the situation, telling his friends that it was "not that big of deal" and to calm down.

{¶7} Long ordered the men to leave, and Houston walked to a gray Hyundai Sonata. Thompson said that Houston opened the car door and appeared to be searching for something on the driver's side, which was illuminated by a dome light. Houston then got in his car.

{¶8} LaRay Bush, one of Houston's friends, threatened Salter and the security guards, stating "I carry heat, I'll get you," although no one saw him with a weapon. Bush refused orders to leave, so Long tased him. But Bush wore a "bubble coat" that prevented the barbs of the Taser from touching his skin. He pulled the barbs out of his coat. Bush was still being loud and aggressive, but he retreated to Houston's car and got into the back seat on the driver's side.

{¶9} Houston drove his car around the parking lot, but he did not leave the area. Thompson said that "we felt that there was probably about to be something going on that we needed to be concerned about." Houston drove his car through the

Super 8 parking lot and back through the lounge's parking lot at least two times, possibly three. Long described the car as doing "a loop-around thing."

{¶10} In the meantime, Salter had been trying to get back in the building. Thompson and the security guards were trying to get Salter to leave. They chased him, but he ran a few feet ahead of them. Thompson was about two feet away from Salter when he saw a "muzzle flash" and heard five gunshots.

{¶11} Salter was near the club's entrance when Houston's car drove by him. The driver's side of the car faced Salter, and the driver's side window was halfway down. Long was about ten feet away from Salter when he heard a scream and four to five gunshots. Afterward, Salter was on the ground, and Houston's car drove away. Five shell casings from a .40-caliber Smith and Wesson were later found in the parking lot.

{¶12} The Springdale Police Department put out a broadcast asking other police departments to be on the lookout for a gray late-model Hyundai Sonata involved in a shooting. Green Hills Police Officer Zachary Clark heard the broadcast about 1:30 a.m. Within five minutes, he saw the Hyundai driving south on Winton Road. He called for backup, and when other police officers arrived, he pulled over the car. Houston was driving, and Bush and Keonta Hardy were in the back seat. All three were placed in handcuffs and detained for Springdale police.

{¶13} Springdale Police Detective Eric Langevin and his officers took Houston and his passengers to the Springdale Police Department. The police officers immediately took Houston's jacket for lab analysis. Houston was sweating profusely and was short of breath, so the police called paramedics. The paramedics attempted to cool him off by taking off his shirt and wiping down his upper body.

{¶14} Officer Clark had followed Houston for about a mile before pulling him over. Video footage from the cruiser showed that a gun was thrown from the car near Cherry Blossom and Winton Roads. It landed in a grassy area next to a driveway. About 2:40 p.m. the same day, a citizen called the police to report that a firearm was in his front yard. The police collected it and determined that it was the weapon used in the shooting.

{¶15} Houston's DNA was found on the magazine of the gun. All three occupants of the car were tested for the presence of gunshot residue. There was no gunshot residue on Houston's hands, but some was found on his jacket. Gunshot residue was found on both Bush's and Hardy's hands.

{¶16} Houston was charged with aggravated murder, murder and felonious assault, with accompanying firearm specifications. A jury trial resulted in a hung jury and a mistrial. After a second trial, a jury found Houston guilty as charged, except for one of the firearm specifications. The other charges were merged with the aggravated-murder charge. Houston was properly sentenced, and this appeal followed.

### *Weight and Sufficiency*

{¶17} In his first assignment of error, Houston contends that the evidence was insufficient to support his conviction. First, he argues that the state failed to present sufficient evidence to prove prior calculation and design.

{¶18} Houston was convicted of aggravated murder under former R.C. 2903.01(A). It provided that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." To show prior calculation and design, the state must show a "scheme designed to implement the calculated decision to kill." *State v. Coley*, 93 Ohio St.3d 253, 263, 754 N.E.2d 1129 (2001). Evidence of purpose

does not automatically mean that the element of prior calculation and design also exists. *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 17. "All prior calculation and design offenses will necessarily include purposeful homicides; not all purposeful homicides have an element of prior calculation and design." *State v Jones*, 2020-Ohio-281, 151 N.E.3d 1059, ¶ 11 (1st Dist.), quoting *Walker* at ¶ 18. The phrase "prior calculation and design" suggests advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is insufficient. *Walker* at ¶ 18.

{¶19} The Ohio Supreme Court has repeatedly held that there is no "bright-line test that emphatically distinguishes between the presence or absence" of prior calculation and design. Instead, each case turns on its own facts. *Walker* at ¶ 19; *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997); *Jones* at ¶ 13. In determining whether a defendant acted with prior calculation and design, courts should consider three factors: (1) Did the accused and the victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events?" *Walker* at ¶ 20; *Taylor* at 19; *Jones* at ¶ 13.

{¶20} Nothing in the record shows that Houston and Salter knew each other prior to the fight. During the fight, Salter punched Houston several times, and Houston had a black eye and other injuries. Security had broken up the fight and forced the participants out a side door. Outside, security guards formed "a wall" between Salter and some of the other participants, including Bush. According to Long, Salter was trying to de-escalate the situation, telling his friends to calm down.

{¶21}  When told to leave, Houston walked to his car, turned on the dome light, and appeared to be searching for something on or around the driver's seat.  He drove his car through the lounge parking lot and the parking lot of the motel next door.  He circled around the lot and passed the lounge entrance at least two, possibly three times.  As soon as Salter started running away from the building, Houston drove by him with the driver's side of the car facing Salter.  Salter was about two feet away from Thompson when Thompson saw a muzzle flash from the driver's side of the car and heard four or five gunshots.  Salter fell to the ground bleeding and Houston drove away at a high rate of speed.

{¶22}  The evidence showed that Houston gave thought and consideration to choosing the murder site and that the act was drawn out, rather than an instantaneous eruption of events after the fight.  *Compare Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, at ¶ 23-26 (No prior calculation and design when the evidence showed a "free-for-all" and a shot was fired in the midst of the fight).  Even though only a short period of time had passed, the facts were sufficient to show that Houston had "adopted a plan to kill."  *See State v. Washington*, 1st Dist. Hamilton No. C-090561, 2010-Ohio-3175, ¶ 17.  Thus, the state presented evidence from which a jury could reasonably have concluded that Houston acted with prior calculation and design.

{¶23}  Houston next argues that there was no evidence showing that he was the assailant, and that, in fact, the evidence showed that Bush was the shooter.  The eyewitnesses stated that Houston was driving the car and that Bush was seated in the back seat on the driver's side.  Thompson saw Houston looking around the car for something before he got inside.  Video footage showed that the driver's-side window was down right before the shooting and the back-seat window was closed.  The flash

came from the driver's seat. When the car was pulled over after the shooting, the back window on the driver's side was intact, indicating that a bullet had not been shot through the window.

{¶24} After Houston walked to his car, Bush continued to act aggressively. Thompson said that when he put his hands on Bush, he felt what may have been a weapon under his coat. Bush continued to try to attack Salter, but was prevented from doing so by the security guards. Bush threatened Salter and the security guards, stating that "I carry heat." When Bush continued to be aggressive and refused to leave, Long tased him, although the Taser had little effect because of Bush's coat. But even after Long attempted to tase him, Bush did not show a weapon of any kind. Instead, he got into Houston's car.

{¶25} Gunshot residue was found on Hardy's and Bush's hands, but not Houston's. But, Houston was not tested for gunshot residue immediately. Because he was sweating profusely and appeared to be ill, the Springdale police called for EMTs, who tried to cool him down by wiping down his body with paper towels. Detective Langevin acknowledged that failing to test Houston's hands for gunshot residue before that time was a mistake.

{¶26} Nevertheless, gunshot residue was found on the cuff of Houston's jacket, and a forensic scientist who specialized in gunshot residue said the residue would float like a cloud all around the area where the gun was fired. Further, Houston's DNA was found on the magazine of the gun, but Bush's DNA was excluded. Thus, there was evidence was from which a jury could reasonably have found that Houston, not Bush, was the shooter.

{¶27} Houston points out that the jury did not find him guilty of a specification that he "had a firearm on or about his person or under his control while

committing the offense of aggravated murder and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the offense * * *." Thus, Houston argues, the jury must have concluded that he was not the shooter. But the jury did find him guilty of a specification that he had a firearm on or about his person or under his control while committing aggravated murder. Thus, the acquittal on the one specification did not show that the jury believed Bush was the shooter.

{¶28} Further, inconsistent responses within the same count of an indictment, such as a conviction on a principal charge and a concurrent acquittal on a specification for identical behavior, do not mandate a reversal where the principal charge is not dependent on a finding of the specification. Similarly, acquittal on one specification and a guilty finding on another do not justify a reversal. *State v. Glenn*, 1st Dist. Hamilton No. C-090205, 2011-Ohio-829, ¶ 69.

{¶29} Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the state proved beyond a reasonable doubt all of the elements of aggravated murder and the accompanying specification. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 29. Therefore, the evidence was sufficient to support the conviction, and we overrule Houston's first assignment of error.

{¶30} In his second assignment of error, Houston contends that his conviction was against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse his convictions and order a new trial.

9

Therefore, the conviction was not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Cedeno,* 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E.2d 582, ¶ 25 (1st Dist.).

**{¶31}** Houston contends that "[n]ot one credible witness can say who the shooter was." But matters as to the credibility of evidence were for the trier of fact to decide. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 116; *State v. Walker*, 1st Dist. Hamilton No. C-190193, 2020-Ohio-1581, ¶ 62. Therefore, we overrule Houston's second assignment of error.

### *Proposed Jury Instructions*

**{¶32}** In his third assignment of error, Houston contends that the trial court erred when it denied his requested jury instructions. He argues that because his jury instructions accurately stated the law and provided needed clarification, the trial court abused its discretion in failing to give those instructions. This assignment of error is not well taken.

**{¶33}** A trial court must fully and completely give the jury all instructions that are relevant and necessary for the jury to weigh the evidence and to discharge its duty as the factfinder. *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus; *State v. Robinson*, 1st Dist. Hamilton No. C-060434, 2007-Ohio-2388, ¶ 18. An appellate court will not reverse a conviction due to improper jury instructions unless the defendant was prejudiced. *Robinson* at ¶ 18. Further, a single instruction cannot be judged in isolation, but must be viewed in the context of the overall charge. *State v. Price*, 60 Ohio St.2d 136, 398 N.E.2d 772 (1979), paragraph four of the syllabus; *Robinson* at ¶ 18.

**{¶34}** A trial court must give the defendant's requested instructions to the jury if they are correct, pertinent statements of law and are appropriate under the

facts of the case. *State v. Lessin*, 67 Ohio St.3d 487, 493, 620 N.E.2d 72 (1993); *State v. Bush*, 1st Dist. Hamilton No. C-090291, 2010-Ohio-2874, ¶ 13. But the court need not give the requested instructions verbatim. It may use its own language to communicate the same legal principles. *Lessin* at 493; *State v. Brewster*, 1st Dist. Hamilton Nos. C-030024 and C-030025, 2004-Ohio-2993, ¶ 58. We review a trial court's decision granting or denying a defendant's proposed jury instruction under an abuse-of-discretion standard. *Bush* at ¶ 13.

{¶35} The first instruction that Houston requested was "[t]he actions of an accused as an accessory after the fact are not prohibited under Ohio law," which was based on *State v. Starr*, 24 Ohio App.2d 56, 263 N.E.2d 572 (1st Dist.1970). That case is very different factually than the present case.

{¶36} In *Starr*, Donald Lewis Grimes stole a purse from a woman standing on the sidewalk. A bystander saw the defendant driving a car that stopped and picked up Grimes. Grimes was in the defendant's car when he was arrested and objects belonging to the woman whose purse was stolen were found in the glove compartment of the car. The defendant was prosecuted for aiding and abetting Grimes in the robbery.

{¶37} This court held that there was no evidence to show that the defendant did anything to aid, abet or conspire with Grimes prior to the robbery. We stated, "The only reasonable inference that can be drawn from the evidence in the instant case is that [the defendant] may have been guilty of being an accessory after the fact, which is not a crime recognized in Ohio." *Id.* at 58. A number of cases have distinguished *Starr* on the basis that the accused was associated with and in the presence of the principal offender before the crime was committed, and therefore, the accused could be convicted of aiding and abetting the principal offender. *See*

*State v. Tribble*, 9th Dist. Summit No. 10685, 1982 WL 2795, *2 (Oct. 13, 1982);

*State v. Monroe*, 8th Dist. Cuyahoga No. 36166, 1977 WL 201419, *2 (June 30, 1977);

*State v. Goudlock*, 8th Dist. Cuyahoga No. 35172, 1976 WL 191107, *4 (Oct. 14, 1976).

{¶38} This case is distinguishable as well, and therefore, the proposed instruction was not appropriate under the facts of the case. Even if Bush was the shooter, Houston did not merely drive the car away after the fact. He was involved in the fight with Salter. After the fight, he went to car, appeared to search for something in his car, and circled the lot several times. Bush got in Houston's car and then Houston drove his car with the driver's side very close to Salter. After the shooting, Houston sped out of the parking lot. After the police began following his vehicle, he or one his passengers threw the gun, which bore his DNA, out of the car.

{¶39} In instructing the jury, the trial court followed the language of *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus, in which the Ohio Supreme Court stated,

> To support a conviction for complicity by aiding and abetting * * *, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared in the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime.

*Accord State v. Johnson*, 1st Dist. Hamilton No. C-170371, 2018-Ohio-4131, ¶ 45-46; *Brewster*, 1st Dist. Hamilton Nos. C-030024 and C-030025, 2004-Ohio-2993, at ¶ 53-54. The proposed instruction contradicts the holding of *Johnson*. It also might have confused the jury and stopped them from considering Houston's actions after the crime, which were relevant.

12

{¶40} Houston's other proposed jury instruction stated, "In order to be guilty of complicity, one must take an affirmative act toward the commission of the crime, rather than simply sitting silently or failing to object or stop the putative other actor." The court's instructions included this proposed instruction in substance. It used its own language to communicate the same principles. This is particularly true given that it stated that mere presence at the scene was insufficient to prove that Houston was an aider and abettor.

{¶41} The trial court fully and completely gave the jury all instructions that were relevant and necessary for the jury to decide the case. We cannot hold that Houston was prejudiced by its decision denying his request for proposed jury instructions. The court's decision was not so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. *See State v. Clark,* 71 Ohio St.3d 466, 470, 644 N.E.2d 331 (1994); *State v. Brown*, 1st Dist. Hamilton No. C-120327, 2013-Ohio-2720, ¶ 34. Therefore, we overrule Houston's third assignment of error.

### *Gruesome Photographs*

{¶42} In his fourth assignment of error, Houston contends that the trial court erred in admitting unfairly prejudicial photographs into evidence. He argues that the photographs were not relevant as he did not dispute the cause of death, and they were unduly gruesome and served only to inflame the jury. This assignment of error is not well taken.

{¶43} Under Evid.R. 403, the decision whether to admit photographs into evidence lies within the trial court's discretion. Gruesome photographs are admissible at trial as long as their probative value is not substantially outweighed by the danger that the accused will be unfairly prejudiced. *State v. Maurer*, 15 Ohio

St.3d 239, 264-265, 473 N.E.2d 768 (1984); *State v. Cephas*, 1st Dist. Hamilton No. C-180105, 2019-Ohio-52, ¶ 27. Even if a photograph satisfies this balancing test, it is inadmissible if it is repetitive or cumulative. *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 237.

{¶44} To prove aggravated murder, "the state must prove, and the jury must find, that the killing was purposely done. The number of shots fired, the places where the bullets entered the body, and the resulting wounds are all probative evidence of a purpose to cause death." *Maurer* at 265, quoting *State v. Strodes*, 48 Ohio St.2d 113, 116, 357 N.E.2d 375 (1976). The fact that Houston stipulated the cause of death does not automatically render the photographs inadmissible. Evid.R. 403 requires a balancing analysis, and the trial court could properly find that the photographs had probative value above and beyond the stipulation. *Maurer* at 265.

{¶45} The court admitted ten photographs into evidence. The coroner actually took 75 photographs. The ten photographs show the entrance and exit wounds of the bullets through the body, and they were used to illustrate the coroner's testimony about the trajectory of the bullets. *See Ford* at ¶ 245-255. None of them were particularly gruesome, except one. That photograph was used to show one of the bullet's path through Salter's liver and other internal organs and to demonstrate the cause of death.

{¶46} Our review of the record does not show that the photographs were unnecessarily gruesome or cumulative. Their probative value was not outweighed by the danger of unfair prejudice to Houston. We cannot hold that the trial court's decision to admit the photos into evidence was so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion. *See State v. Smith*, 80 Ohio

St.3d 89, 108-109, 684 N.E.2d 668 (1997); *Cephas*, 1st Dist. Hamilton No. C-180105, 2019-Ohio-52, at ¶ 30. We overrule Houston's fourth assignment of error.

### *Jury Verdict/Ineffective Assistance of Counsel*

**{¶47}** Houston's fifth and sixth assignments of error are related and argued together. In his sixth assignment of error, he contends that because a juror stated after trial that the guilty verdict was not her true verdict, there was not a unanimous jury verdict, and he was denied due process. In his fifth assignment of error, he contends that he was denied the effective assistance of counsel because his trial counsel did not challenge the verdict or move for a mistrial. These assignments of error are not well taken.

**{¶48}** A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 524 N.E.2d 476 (1988); *Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, at ¶ 36. To sustain a claim for ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hackney* at ¶ 36.

**{¶49}** The record shows that at sentencing, Houston's attorney told the court that as he and another defense attorney were leaving the courtroom after trial, juror number four had approached them, sobbing uncontrollably. He stated that the juror had "indicated that probably wasn't her true verdict. She felt pressured into rendering the verdict that she did." Houston's attorney said this in arguing for mitigation at sentencing, but did not ask for a mistrial or other affirmative relief.

15

**{¶50}** The Ohio Supreme Court has stated that a jury verdict becomes final once the jury has been polled and each juror has assented to the verdict in open court. *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 34. The function of the poll is "to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented." *Id.* at ¶ 37, quoting *Miranda v. United States*, 255 F.2d 9, 17 (1st Cir.1958). Once that function has been accomplished, there is no compelling reason to let individual jurors change their mind. *Williams* at ¶ 37.

**{¶51}** "A verdict becomes immutable by the jury once announced in open court or when it has been confirmed by a poll * * *." *Williams* at ¶ 35, quoting *United States v. Dakins*, 872 F.2d 1061, 1065 (D.C.Cir.1989). Thus, once a poll of the jurors has been completed and all have assented to the verdict, a juror may not rescind or modify his or her vote. *Williams* at syllabus. When the jury was polled, juror number four confirmed her verdict in open court. After that, she could not rescind or modify her vote.

**{¶52}** Further, under the aliunde rule, a jury's verdict may not be impeached by evidence from a member of the jury unless a foundation is laid by evidence aliunde. Evidence aliunde is extraneous, independent evidence of alleged misconduct based on the firsthand knowledge of someone who is not a juror. Evid.R. 606(B); *State v. Schiebel*, 55 Ohio St.3d 71, 75, 564 N.E.2d 54 (1990); *Fehrenbach v. O'Malley*, 1st Dist. Hamilton No. C-100730, 2011-Ohio-5481, ¶ 41. The purpose of the rule is to protect the finality of verdicts and to ensure that jurors are insulated from harassment by defeated parties. *Schiebel* at 75.

{¶**53**} The failure to file or prosecute a motion is prejudicial only if the defendant has a reasonable probability of success on that motion. *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65; *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 53. Juror number four's verdict was final and could not be impeached in the absence of outside evidence, which the record does not show that defense counsel possessed.

{¶**54**} Under the circumstances, no motion for a mistrial or other relief based on juror number four's statement to counsel would have had a reasonable probability of success. Therefore, counsel's failure to file such a motion was not prejudicial and did not constitute ineffective assistance of counsel. We overrule Houston's fifth and sixth assignments of error.

### *Search and Seizure*

{¶**55**} In his seventh assignment of error, Houston contends that the trial court erred in denying his motion to suppress evidence recovered from a warrantless search of his vehicle. He argues that there was no proper basis for the stop of his vehicle and that, even if the stop was proper, the degree of intrusion was not reasonably related to the reason for the stop. This assignment of error is not well taken.

{¶**56**} Appellate review of a motion to suppress presents a mixed question of law and fact. We must accept the trial court's findings of fact as true if competent, credible evidence supports them. But we must independently determine whether the facts satisfy the applicable legal standard. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Ojile*, 1st Dist. Hamilton Nos. C-110677 and C-110678, 2012-Ohio-6015, ¶ 61.

17

{¶**57**} An investigative stop is a seizure within the meaning of the Fourth Amendment that must be supported by objective justification. *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991); *State v. Lopez*, 166 Ohio App.3d 337, 2006-Ohio-2091, 850 N.E.2d 781, ¶ 13 (1st Dist.). The standard is not probable cause but reasonable suspicion, which is less demanding. *State v. Erkins*, 1st Dist. Hamilton No. C-110675, 2012-Ohio-5372, ¶ 32; *Lopez* at ¶ 13. The police officers must point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Andrews* at 87, quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The standard is objective: would the facts available to the officers at the moment of the seizure have warranted an individual of reasonable caution in the belief that the action taken was appropriate? *Andrews* at 87; *Lopez* at ¶ 13.

{¶**58**} Specifically, in relation to automobiles, if there is a reasonable and articulable suspicion that an automobile or its occupants are subject to seizure for a violation of the law, stopping that automobile and detaining its occupants are reasonable under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Erkins* at ¶ 32. A court determines the validity of an investigative stop by looking at the totality of the circumstances. *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus; *Lopez* at ¶ 14.

{¶**59**} At the hearing on the motion to suppress, Detective Langevin testified that after the shooting, his department sent out a broadcast asking other police departments to be on the lookout for a gray Hyundai Sonata. The broadcast stated that three or four black males were in the car, who had been involved in a fight, and that one of them had major facial injuries because of the fight. The car was last seen

18

heading south on Route 4. About ten minutes later, Langevin received a notification that a car matching that description had been stopped about five miles from the lounge.

{¶60} Officer Clark testified that at about 1:30 a.m., he was driving a marked vehicle heading north on Winton Road when he received the radio broadcast. He saw a car heading south on Winton Road matching the description of the car in the broadcast. Clark did a U-turn, got behind the car, and started following it. He notified the Springdale Police Department and called for backup because he considered it a high-risk stop. He followed the car for roughly a mile. Once backup arrived, Clark initiated the traffic stop. He ordered Houston, the driver, out of the car. Once they took Houston into custody, Clark noticed that he had bruising and swelling on his face. The other two occupants of the car were ordered out of the car, and all three were put in separate vehicles.

{¶61} Langevin responded to the scene of the traffic stop. He had two pictures on his phone of Houston and another individual involved in the fight taken from the video surveillance cameras at the lounge. He identified Houston and specifically noted that he had facial injuries consistent with having been in a fight. Houston was then arrested.

{¶62} In ruling on a motion to suppress, a court may consider the collective knowledge of police officers involved in a common investigation. *State v. Henderson*, 51 Ohio St.3d 54, 57, 554 N.E.2d 104 (1990); *Erkins*, 1st Dist. Hamilton No. C-110675, 2012-Ohio-5372, at ¶ 33. Police may rely on information broadcast over the police radio for reasonable suspicion to make an investigatory stop or for probable cause to make an arrest. *State v. Fultz*, 13 Ohio St.2d 79, 234 N.E.2d 593 (1968), paragraph two of the syllabus; *State v. Bryant*, 138 Ohio App.3d 343, 345,

741 N.E.2d 225 (1st Dist.2000). Where an officer making an investigatory stop relies solely on a dispatch, the state must demonstrate that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity. *Maumee v. Weisner*, 87 Ohio St.3d 295, 297-298, 720 N.E.2d 507 (1999); *Bryant* at 345.

{¶63} The broadcast provided a reasonable and articulable suspicion that the car and its occupants were subject to seizure for a violation of the law. A car and its occupants matching the description were spotted ten minutes later a few miles from the shooting. Officer Clark thought that because it involved a shooting, there might have been a gun in the car, so he was justified in waiting for backup. The seizure of the car and its occupants was justified under the Fourth Amendment.

{¶64} Once a vehicle has been lawfully detained, police officers may order the driver to get out of the car without violating Fourth Amendment proscriptions against unreasonable searches and seizures. *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *State v. Emmons*, 1st Dist. Hamilton No. C-150636, 2016-Ohio-5384, ¶ 14. Further, the temporary seizure of a vehicle's occupants in a traffic stop ordinarily remains reasonable during the officer's investigation into matters related to the justification for the stop. *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009); *Emmons* at ¶ 12.

{¶65} Officer Clark was justified in ordering the occupants out of the car and separating them until Detective Langevin could identify whether they were the individuals involved in the fight and the shooting at the lounge. *See Bryant*, 138 Ohio App.3d at 346, 741 N.E.2d 225. Once Detective Langevin identified Houston and the others, the police officers had probable cause to arrest Houston. *See State v. Heston*, 29 Ohio St.2d 152, 155-156, 280 N.E.2d 376 (1972); *State v. Morrison*, 1st

Dist. Hamilton No. C-120406, 2013-Ohio-928, ¶ 11-12; *Erkins*, 1st Dist. Hamilton No. C-110675, 2012-Ohio-5372, at ¶ 33.

{¶66} Further, the police were justified in searching the car under the automobile exception to the warrant requirement because they had probable cause to believe that they would discover evidence of a crime. *See State v. Moore*, 90 Ohio St.3d 47, 51, 734 N.E.2d 804 (2000); *In re L.S.*, 1st Dist. Hamilton No. C-150526, 2016-Ohio-5582, ¶ 15-19; *Lopez*, 166 Ohio App.3d 337, 2006-Ohio-2091, 850 N.E.2d 781, at ¶ 22. Consequently, we overrule Houston's seventh assignment of error.

### *Summary*

{¶67} In sum, we hold that: (1) the evidence was sufficient to support Houston's conviction and the accompanying specification; (2) the conviction was not against the manifest weight of the evidence; (2) the trial court did not err in failing to give Houston's proposed jury instructions; (4) the trial court did not abuse its discretion in admitting gruesome photographs; (5) the juror's verdict could not be challenged, and Houston was not denied due process due to the lack of a unanimous jury verdict; (6) Houston was not denied the effective assistance of counsel; and (7) the trial court did not err in overruling his motion to suppress evidence recovered from the warrantless search of his vehicle. Therefore, we overrule his seven assignments of error and affirm his conviction.

Judgment affirmed.

**BERGERON** and **CROUSE, JJ.,** concur.

Please note:

The court has recorded its own entry this date.